# United States Court of Appeals
## For the First Circuit

—————————————

No. 00-2504

THEODORE TRIGONES,

Petitioner, Appellant,

v.

LYNN BISSONNETTE, SUPERINTENDENT,
NORTH CENTRAL CORRECTIONAL INSTITUTION,

Respondent, Appellee.

—————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

—————————————

Before

Lynch, Circuit Judge,
Bownes and Magill,[*] Senior Circuit Judges.

—————————————

Judith Farris Bowman for appellant.

William J. Meade, Assistant Attorney General, with whom Thomas
F. Reilly, Attorney General, was on brief for appellee.

—————————————

July 10, 2002

—————————————

—————————————

[*] Of the United States Court of Appeals for the Eighth
Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**. This is a habeas corpus case involving a state prisoner and raising Confrontation Clause questions. The district court denied habeas relief; we find the question closer, but affirm the denial of relief because the state court decision affirming petitioner's murder conviction cannot be said to be an unreasonable application of clearly established federal law, as determined by the Supreme Court.

## I.

On July 1, 1983, a thirteen-year-old babysitter, Erica Forestiere, was stabbed to death between 12:30 a.m. and 2:30 a.m. while her two young charges slept upstairs. In 1984, a state court jury convicted Theodore J. Trigones of the crime, finding him guilty of first degree murder. He was sentenced to life imprisonment without parole.

Trigones's defense at trial was that the father of the children, Leo Trzcinski Jr., intending to kill his estranged wife, had mistakenly killed Forestiere, the babysitter. Trigones testified that, on the night of the murder, he went to the Trzcinski residence, where he encountered Trzcinski sitting near the already dead babysitter.

Later that night, Trigones spoke with his stepfather, Roland Weed. At a pretrial hearing on Trigones's motion to suppress, Weed testified that Trigones, in the early morning hours following the murder, had said "I've done something terrible" or "I did something terrible." At that same hearing, Weed also testified that he understood Trigones to say "I killed someone," and that

Trigones said something like "[t]here's a lot of hate in me" and "if it wasn't her it would have been somebody else."

The only purpose of this pretrial hearing was to determine whether Trigones's statements to Weed were voluntary and products of a rational intellect, given Trigones's contemporaneous drug and alcohol ingestion.[1] The trial court found the statements voluntary and admissible.

Trigones was denied the opportunity to confront Weed at trial. An edited version of the transcript of Weed's suppression hearing testimony was read to the jury, over Trigones's objection, when Weed exercised his Fifth Amendment rights by refusing to testify at trial. Trigones sought interlocutory relief on the question of the admissibility of the Weed testimony and lost.

At trial, Trigones testified and pointed the finger at Trzcinski. Trigones also attempted to counter Weed's statement. He testified that what he had said to Weed was not that he, Trigones, had killed someone, but that it was Trzcinski who had killed someone, although, in the conversation with Weed, Trigones did not name Trzcinski as the killer. Trigones testified that he had told Weed that there is a lot of hate in him, meaning

---

[1] Although the federal constitutional prohibition against coerced statements does not cover private citizens' conduct, Colorado v. Connelly, 479 U.S. 157, 166 (1986), "[u]nder Massachusetts law, statements extracted by private citizens, even absent governmental involvement, are subject to suppression under the involuntariness standard," P.J. Liacos et al., Handbook of Massachusetts Evidence § 9.3, at 591 (7th ed. 1999) (citing Commonwealth v. Mahnke, 368 Mass. 662, 335 N.E.2d 660, 672 (1975)). We understand Trigones's suppression hearing argument to have focused more on whether his inculpatory statements were products of a rational intellect.

Trzcinski, and that, if it wasn't her (the babysitter), he, again meaning Trzcinski, would have killed someone else. Trzcinski also testified and provided a version of the facts which, if credited, exculpated him. The jury had the opportunity to hear from both Trigones and Trzcinski and to evaluate which witness to believe and who was the killer.

Weed's testimony, read into evidence at trial, was an important element of the Commonwealth's case. Trigones's alleged confession, as recounted by Weed, was a significant part of the evidence tending to show that Trigones, rather than Trzcinski, committed the murder. Indeed, as the federal district court that heard this habeas petition noted, "Weed's testimony recounting [Trigones's] alleged confession was likely some of the most damning evidence." Trigones v. Hall, 115 F. Supp. 2d 158, 171 (D. Mass. 2000). The differences between Trigones's version of his statement to Weed and Weed's version of Trigones's statement make all the difference, according to Trigones, because Trigones's version is an admission only to being an accessory after the fact, whereas Weed's version is an admission that Trigones committed the murder himself.

The jury convicted Trigones, and the Supreme Judicial Court of Massachusetts ("SJC") affirmed the jury's verdict on appeal, Commonwealth v. Trigones, 397 Mass. 633, 492 N.E.2d 1146 (1986). The SJC rejected Trigones's argument that, under the Confrontation Clause, the court should not have admitted Weed's statement. Id. at 1150. It concluded that, under Ohio v. Roberts, 448 U.S. 56 (1980), the testimony was admissible because Weed was

-4-

unavailable[2] to testify at trial and his suppression hearing testimony bore adequate indicia of reliability. Trigones, 492 N.E.2d at 1149-50.

In 1991 Trigones filed a new trial motion based on ineffective assistance of counsel. The trial court initially denied the motion without a hearing. A single justice of the SJC then denied Trigones's motion for leave to appeal the denial, but remanded to the trial court for an evidentiary hearing because the justice could not make the requisite ineffective assistance of counsel determination on the record as it existed at the time. The trial court held an evidentiary hearing at which Trigones's trial counsel testified. After this hearing, the trial court again denied the motion and a single justice of the SJC then denied Trigones's motion for leave to appeal. Trigones next filed an unsuccessful action in the SJC for a declaration that it was unconstitutional to deny him the right to appeal from the denial of the new trial motion. Trigones v. Attorney Gen., 420 Mass. 859, 652 N.E.2d 893 (1995).

In 1997, some thirteen years after his conviction, Trigones sought federal habeas corpus relief. He argues that the admission into evidence of the transcript of Weed's testimony denied him his rights under the Confrontation Clause of the Sixth Amendment to cross-examine Weed at trial. The district court

---

[2] The parties do not dispute Weed's status as an unavailable declarant; Weed successfully asserted, on Fifth Amendment grounds, that he could not be compelled to testify, Commonwealth v. Weed, 17 Mass. App. Ct. 463, 459 N.E.2d 144, 148 (1984).

denied the writ, holding 1) that it was bound by what it considered the SJC's not-clearly-erroneous factual conclusion that Trigones abandoned his bias line of questioning at the suppression hearing and 2) that Trigones had failed to raise before the state courts his argument that his counsel had lacked a similar motive to cross-examine at the suppression hearing.  Trigones, 115 F. Supp. 2d at 172-73.

Although Trigones's argument is far from frivolous, we affirm the district court's denial.  In light of the particular circumstances of this case, we cannot say that the SJC's conclusion was unreasonable.

**II.**

Trigones makes a two-part argument[3]: (1) that admission at trial of the Weed transcript violated his Sixth Amendment right to confront Weed; and (2) that the SJC's decision that there was no Sixth Amendment violation was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (2000).

There is no credible argument that this case fits within the "contrary to" framework of analysis.  See Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Hurtado v. Tucker, 245 F.3d 7, 15 (1st

---

[3]    Trigones requested an expanded certificate of appealability to permit him to pursue claims of ineffective assistance of counsel and claims that the state procedures for post-conviction petitions violate due process and equal protection. This court denied the request.

Cir.), cert. denied, 122 S. Ct. 282 (2001). This is simply because Trigones has not shown that the SJC's decision "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law." Williams, 529 U.S. at 405; see also Bell v. Cone, 122 S. Ct. 1843, 1850 (2002). Nor has he shown that the SJC "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a[n opposite] result." Williams, 529 U.S. at 405; see also Bell, 122 S. Ct. at 1850. Because the SJC adjudicated the constitutional claim on its merits, we apply the deferential, statutory "unreasonable application" test, 28 U.S.C. § 2254(d)(1),[4] and do not review the SJC's constitutional conclusion de novo. Cf. Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) (stating that "we can hardly defer to the state court on an issue that the state court did not address"), cert. denied, 122 S. Ct. 1609 (2002). Even an incorrect state court decision is not necessarily an "unreasonable" one for habeas purposes. Williams, 529 U.S. at 410 (stating that "an unreasonable application of federal law is different from an incorrect application of federal law"); see also Bell, 122 S. Ct. at 1850.

---

[4]     Though the Commonwealth attempts to characterize portions of the SJC's determination as determinations of fact entitled to a presumption of correctness rebuttable only by clear and convincing evidence, § 2254(d)(2)'s heightened standard "applies only to determinations of 'basic, primary, or historical facts.'" Ouber v. Guarino, No. 01-2390, 2002 U.S. App. LEXIS 11885, at *22 (1st Cir. June 17, 2002) (quoting Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001)). "Inferences, characterizations of the facts, and mixed fact/law conclusions are more appropriately analyzed under" § 2254(d)(1). Id.

The "unreasonable application" issue is measured against the Sixth Amendment's requirements for the admission of prior preliminary judicial hearing testimony of a witness who is unavailable at trial. The Sixth Amendment's Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. It applies to the states through the Fourteenth Amendment's Due Process Clause. Pointer v. Texas, 380 U.S. 400, 403 (1965).

The Confrontation Clause does not prohibit the admission of all hearsay evidence. Idaho v. Wright, 497 U.S. 805, 813-14 (1990); Mattox v. United States, 156 U.S. 237 (1895). Although "a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, [the Supreme] Court has rejected that view as 'unintended and too extreme.'" Bourjaily v. United States, 483 U.S. 171, 182 (1987) (quoting Roberts, 448 U.S. at 63). "[T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." Barber v. Page, 390 U.S. 719, 722 (1968). That is because "the right of cross-examination initially afforded provides substantial

compliance with the purposes behind the confrontation requirement."
Id.[5]

Where hearsay evidence is offered, and that evidence consists of testimony by an unavailable declarant, the Confrontation Clause requires that the proponent (here the Commonwealth) show that the transcribed testimony from the preliminary judicial hearing bears adequate "indicia of reliability," sufficient to offset the lack of cross-examination. Roberts, 448 U.S. at 65-66 (quoting Dutton v. Evans, 400 U.S. 74, 89 (1970) (plurality)); see also Wright, 497 U.S. at 815-25 (applying the Roberts framework); 2 McCormick on Evidence § 252, at 123-24 (J.W. Strong ed., 5th ed. 1999) (outlining the Confrontation Clause's standard for admission of prior testimony). Adequate indicia are shown if the proffered testimony "falls within a firmly rooted . . . exception" to the hearsay prohibition or if the proponent of the evidence makes a showing of "particularized

---

[5] The issue of use of prior hearing testimony at trial of a newly unavailable witness is not one-sided. In the reported caselaw under Fed. R. Evid. 804(b)(1), it is frequently the prosecution which objects to the use of the testimony on the basis that it lacked an opportunity or similar motive to cross-examine. E.g., United States v. Bartelho, 129 F.3d 663, 670-72 (1st Cir. 1997) (holding suppression hearing statements inadmissible where government's motive to cross-examine on the issue of voluntariness, at a suppression hearing in a case against the declarant, differed from the government's motive at a different trial, at which the declarant's testimony inculpated the defendant); United States v. Omar, 104 F.3d 519, 523-24 (1st Cir. 1997) (excluding from trial prior grand jury testimony of witness who died in the interim, where government lacked similar motive to cross-examine); United States v. Wingate, 520 F.2d 309, 316 (2d Cir. 1975) (affirming the exclusion of evidence given at a suppression hearing on voluntariness by a witness unavailable at trial, because of difference in government's motive to cross-examine).

guarantees of trustworthiness."  Roberts, 448 U.S. at 66.  If the testimony is within a firmly rooted hearsay exception, then it has adequate indicia of reliability, without more.  White v. Illinois, 502 U.S. 346, 355 n.8 (1992); Roberts, 448 U.S. at 66.

The federal and state hearsay rules, although they do not control the constitutional inquiry, are instructive because they outline the contours of the firmly rooted hearsay exception at issue in this case.  We have previously concluded that Fed. R. Evid. 804(b)(1) codifies a firmly rooted exception to the hearsay prohibition, and so evidence admissible under Rule 804(b)(1) is, "by definition, not vulnerable to a challenge based upon the Confrontation Clause."  United States v. McKeeve, 131 F.3d 1, 9 (1st Cir. 1997).

The Federal Rules provide that former testimony is not excluded by the hearsay prohibition if the declarant is unavailable as a witness and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony."  Fed. R. Evid. 804(b)(1); see generally 2 McCormick on Evidence, supra, § 304, at 296-97 (stating that "the issues in the first proceeding, and hence the purpose for which the testimony was offered, must have been such as to produce an adequate motive for testing on cross-examination the credibility of the testimony"). The Massachusetts rule is similar.  See Commonwealth v. Meech, 380 Mass. 490, 403 N.E.2d 1174, 1177-78 (1980); Trigones, 492 N.E.2d at 1149-50; P.J. Liacos et al., Handbook of Massachusetts Evidence § 8.7.1, at 489 (7th ed. 1999) (stating that "[p]rior testimony . . .

-10-

is admissible if it was given under oath in a proceeding where the issues were substantially the same as in the current proceeding and the party against whom it is offered had an opportunity and a similar motive to cross-examine the witness").

Even if the motives to develop the testimony are dissimilar, that does not end the Confrontation Clause inquiry. Although a showing of sufficiently dissimilar motives removes the testimony from the "firmly rooted . . . exception" analysis by placing the testimony outside of Rule 804(b)(1) or any other firmly rooted hearsay exception, the testimony may still be analyzed for "particularized guarantees of trustworthiness" and, if such guarantees are found, admitted into evidence. Roberts, 448 U.S. at 66; see also Lee v. Illinois, 476 U.S. 530, 543 (1986) (stating that hearsay evidence that does not fall within a firmly rooted exception may nonetheless be admitted without violating the Confrontation Clause upon a showing that it has particularized guarantees of trustworthiness). If the testimony is not within a firmly rooted exception, then the proponent must show particularized guarantees of trustworthiness rendering the contested hearsay statement at least as reliable as a statement admissible under a firmly rooted exception. Wright, 497 U.S. at 821 (citing Roberts, 448 U.S. at 66).[6]

---

[6] A failure to meet Rule 804(b)(1)'s requirements does not necessarily imply a failure to meet the Confrontation Clause's requirements. California v. Green, 399 U.S. 149, 156 (1970) (stating that "merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied").

-11-

The SJC correctly articulated the federal constitutional standards; the only issue, then, on federal habeas review is whether the SJC unreasonably applied those standards.

### III.

Trigones, in his habeas appeal, argues that the admission of the Weed transcript violated his Sixth Amendment rights because he was unable to cross-examine Weed on two issues: (1) pro-Commonwealth bias and (2) Weed's ability to recollect accurately the statements Weed recounted. We address bias below, and find that Trigones has failed to exhaust his argument pertaining to Weed's ability to recollect (except to the extent that he is alleging an inaccuracy in Weed's recollection due to bias, as distinguished from inaccuracies resulting from other imperfections in Weed's ability to have perceived and recalled Trigones's statement, such as lack of memory or inability to hear the statements at the time they were allegedly made). The SJC concluded that Trigones's "sole argument" was that "Weed's testimony lacked reliability because he was not fully cross-examined on the possibility that he may have lied in order to protect his wife and himself from prosecution as accessories to the crime." Trigones, 492 N.E.2d at 1150. After closely examining Trigones's arguments presented to the SJC, we agree that Trigones did not make his "inability to recollect" argument before the SJC

and hence, for reasons of lack of exhaustion, he may not raise it now.  <u>Scarpa</u> v. <u>Dubois</u>, 38 F.3d 1, 6 (1st Cir. 1994).[7]

Trigones argued before the SJC that the admission of the Weed transcript violated his Sixth Amendment rights because he was unable to cross-examine Weed on the bias issue.  He claimed that his suppression motion sought to exclude Weed's testimony -- recounting Trigones's statements after the murder -- because Weed's testimony also showed that Trigones was intoxicated on drugs and alcohol and could not have made a voluntary statement.  Bias, Trigones argued to the SJC, was not an issue at the suppression hearing, but would have been an issue at trial if Weed had

_____

[7]     We note there was already substantial evidence in the suppression hearing record, from Weed himself, that although he testified as reliably as he could, his memory of that evening was imperfect.  For example, with respect to events earlier that evening, Weed admitted that his memory was weak: "I don't remember, it's been too long," he said in response to one question; "I don't remember" or "I really don't remember," he replied to about ten other questions.  He also said he was "not really sure" about another statement he attributed to Trigones, and he had to guess at some distances.  Even with respect to the incriminatory statements, Weed offered two versions and then said he could not recall specifics of other statements because he was in shock and that he "was somewhere else at the time."  He recalled that he was "very angry" and "very emotional" during that conversation.  All of these statements were ample support for Trigones to argue his point to the jury, that a tired and upset Weed had misperceived what Trigones said to him.  The point to be made -- that Weed's memory was faulty -- could be argued to the jury from the basic facts.  Indeed, in his closing argument, Trigones argued that the small difference between his own version of his statement on the night of the murder and Weed's version of that statement, as recorded at the suppression hearing, could be explained by the process of Weed's listening to, interpretation of, and "regurgitation" of Trigones's words.  We do not decide that, had Trigones properly presented his argument, all of this would have justified the state court rejecting his claim.  Rather, we present these facts from the record as context to show that the exhaustion requirement has not worked a substantial injustice.

testified.  The asserted bias was in favor of the Commonwealth, and brought about by the interests of Weed and his wife in avoiding being charged "as accessories after the fact to murder."  Trigones, 492 N.E.2d at 1148.

The SJC addressed three issues: (1) "the extent of the asserted restriction of cross-examination," (2) the "Sixth Amendment principles governing the admission of Weed's recorded testimony," and (3) "whether . . . the constitutional standard was satisfied."  Id.  It concluded there was no constitutional violation, id. at 1150, finding that Trigones had an opportunity to cross-examine Weed on bias, although, "[p]erhaps for tactical reasons, defense counsel . . . acquiesced in the judge's suggestion of irrelevance and abandoned that line of questioning," id. at 1149.  The SJC noted that there had been some limited examination on bias at the suppression hearing.  Id. at 1148-49.  As to motive, the SJC concluded that Trigones "should have had the same motive to cross-examine Weed at the pretrial hearing on the relevant issue of bias . . . as he would have had if Weed had testified in person at trial."  Id. at 1150.

These conclusions, if correct (or, for habeas purposes, at least reasonable), were sufficient under clearly established Supreme Court law for the SJC to reject Trigones's Confrontation Clause argument.  The SJC, however, proceeded to address whether Weed's testimony should nonetheless be excluded because Trigones did not adequately pursue his opportunity to cross-examine Weed on bias, and concluded that cross-examination on this point would not

-14-

have made a difference.  Id.  We hold that the SJC's conclusions on opportunity and similar motive were not unreasonable and therefore conclude that Weed's testimony fell within a firmly rooted hearsay exception.  Because it would not have been unreasonable for the SJC to stop the analysis there, given that the Supreme Court has not resolved whether an unexercised opportunity is sufficient to satisfy the Confrontation Clause's requirements, Roberts, 448 U.S. at 61-62, 70-71, we conclude without the need to address the SJC's holding that cross-examination on bias at trial would not have made a difference.

A. Opportunity to Cross-Examine Weed on Bias

The question whether Trigones had an opportunity to pursue his bias line of questioning at the suppression hearing is a very close one.  Even if, faced with the issue on direct appeal, we would have resolved the issue differently, we cannot say that the SJC's conclusion as to opportunity was unreasonable.

The question whether Trigones's counsel, regardless of his motive, had a sufficient opportunity to cross-examine Weed at the suppression hearing turns on one's interpretation of the following exchange, which occurred at the suppression hearing, between counsel (Mr. Delinsky) and Weed, immediately followed by an exchange between counsel and the trial judge:

> Q:          Were you told at that time that Mrs. Weed
>             could not be prosecuted . . . for helping
>             somebody after a crime was committed because
>             she was a blood relative and a mother?  Were
>             you told that by the Police?
>
> A:          No, I wasn't.

-15-

```
Q:          Were you told that by the District Attorney?

THE COURT:  Now wait, Mr. Delinsky, please. Let's
            assume that all of this happened that you're
            asking him. What relevance does it have to
            this hearing?

DELINSKY:   I'll go on.

Q:          Now, --

THE COURT:  No, I mean tell me. What relevance does it
            have? The only thing that I've got to
            decide in this is was his statement that of
            a rational intellect and I'm going to let
            the jury listen.

DELINSKY:   I agree.

THE COURT:  And what he told his wife and what his wife
            did or what he did has got absolutely
            nothing to do with this hearing. Now when
            we get in front of the jury as to what
            caused him to make this statement, that's a
            different story. I'm not going to stop you
            there.

DELINSKY:   Okay, thank you.
```

One view of this colloquy, not unreasonable, is that counsel had an opportunity to engage in the bias line of questioning, but chose not to pursue it. When the trial judge first asked counsel "[w]hat relevance does [this line of questioning] have to this hearing?" counsel's only response was "I'll go on," apparently meaning that he would proceed to a different topic. The judge, refusing to permit counsel to abandon his line of questioning so easily, asked counsel a second time, "[w]hat relevance does [this line of questioning] have?" The judge explained his own reason for thinking that the bias-related question was not relevant, stating "[t]he only thing that I've got to decide in this is was his statement that of a rational

-16-

intellect."  At this point, counsel did not rebut the judge's suggestion of lack of relevance, but instead stated "I agree."

As the SJC concluded, Trigones, 492 N.E.2d at 1149, Weed's purported pro-Commonwealth bias was of course relevant at the suppression hearing, even though the suppression hearing was limited to the rational intellect question.  Pro-Commonwealth bias would tend to diminish the credibility of any of Weed's statements favoring the Commonwealth, and to enhance the force of any of Weed's statements favoring Trigones.  Upon prompting by the trial judge to describe the relevance of the bias line of questioning to the suppression hearing, counsel could have pointed this out. Instead, counsel acquiesced.

We might have decided the opportunity issue differently were it raised on direct appeal, given that counsel might plausibly be understood to have acquiesced not in the face of an invitation to explain the relevance of his inquiry, but rather in light of the trial judge's final conclusion that the line of questioning was not relevant.  This alternative characterization of the colloquy is strengthened by the trial judge's reassuring statement to counsel that "when we get in front of the jury as to what caused him to make this statement, that's a different story.  I'm not going to stop you there."

But the SJC's conclusion that defense counsel, perhaps for tactical reasons, acquiesced and abandoned the bias line of questioning despite the trial judge's invitation to explain its relevance is not "unreasonable" as that term has been interpreted

-17-

under § 2254. Similarly, the conclusion that an opportunity, though hardly used, is sufficient to qualify as an "opportunity" to cross-examine for purposes of the Confrontation Clause is not unreasonable. See Roberts, 448 U.S. at 61-62, 70-71, 73 n.12; Siegfriedt v. Fair, 982 F.2d 14, 19 (1st Cir. 1992) (citing Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam), and Roberts, 448 U.S. at 73 n.12); Fed. R. Evid. 804 advisory committee's note (stating "no unfairness is apparent in requiring [a party] to accept his own prior . . . decision not to cross-examine").

B. Similarity of Motive to Cross-Examine Weed on Bias

In this case, the similarity of motive question is a complicated one. Our analysis differs substantially from the SJC's, but we again conclude that the SJC's position was not unreasonable.[8]

---

[8] The Commonwealth defends the SJC's "similarity of motive" conclusion as being a factual finding to which we must give deference. See 28 U.S.C. § 2254(d)(2). It may be that a court's determination as to similarity of motive is treated as a factual determination. See United States v. Salerno, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring) (stating that Rule 804(b)(1)'s "similar-motive inquiry . . . is inherently a factual inquiry"); Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 552 (5th Cir. 2000) (same in a civil case). If so, it is a factual determination made after comparing the "similarity of the underlying issues" and the context of the prior questioning. Salerno, 505 U.S. at 326. We reiterate, however, that "[i]nferences, characterizations of the facts, and mixed fact/law conclusions are more appropriately analyzed under" § 2254(d)(1). Ouber, 2002 U.S. App. LEXIS 11885, at *22. We need not determine, on these facts, whether the SJC's similarity of motive conclusion was one of law or one of fact because, either way, it was not unreasonable.

-18-

At first cut, there appears to be a substantial argument that Trigones's motive to cross-examine Weed on bias at the suppression hearing was significantly different from the motive he would have had at trial. Weed's suppression hearing testimony that Trigones was incoherent and irrational tended to favor Trigones, who was then trying to prove that his confession was not the product of a rational intellect and, for that reason, should be suppressed. At the suppression hearing, the truth of Weed's rendition of Trigones's statement was not at issue. The only issue was whether Trigones's alcohol and drug intoxication rendered whatever statements he made involuntary. The limited scope of the suppression hearing is evident from the text of Trigones's original motion to suppress, the trial judge's statements at the suppression hearing, and the trial judge's ruling on the motion to suppress, all of which were limited to the issue of voluntariness.

At trial, in contrast, the truth of Weed's testimony about the content of the inculpatory statements was certainly at issue and, when credited, that testimony hurt Trigones. It formed an important part of the evidence tending to implicate Trigones, rather than Trzcinski, in the murder. At trial, one could argue that Trigones had an incentive to attack Weed's credibility and thereby undermine his harmful testimony, whereas at the suppression hearing Trigones had an incentive to defend Weed's credibility and thereby bolster his helpful testimony. Such differences can make for dissimilar motives. Cf. United States v. Bartelho, 129 F.3d 663, 672 (1st Cir. 1997) (concluding that similar motive to cross-

-19-

examine did not exist when, "[a]lthough [the witness's] credibility was generally at issue in each proceeding, . . . the more particular points [counsel] sought to make were quite different").

But the SJC's contrary position, that Trigones "should have had the same motive to cross-examine Weed at the pretrial hearing on the relevant issue of bias in favor of the Commonwealth as he would have had if Weed had testified in person at trial," Trigones, 492 N.E.2d at 1150, is not unreasonable. At both the suppression hearing and at trial Trigones had an incentive to paint Weed as biased in favor of the Commonwealth. Such a characterization would tend to diminish the credibility of any of Weed's statements favoring the Commonwealth. It would also tend to enhance the force of any of Weed's statements favoring Trigones because any such statements, made despite pressure to testify unfavorably to Trigones, could be characterized as all the more believable in light of Weed's incentive to testify contrary to Trigones's interests. At the suppression hearing, showing Weed's pro-Commonwealth bias could only have helped Trigones, by showing that Weed was willing to describe Trigones as unable to make rational statements -- testimony helping Trigones -- despite his incentive to provide testimony favoring the Commonwealth, and perhaps by casting doubt on whether Trigones even made the exact statements that Weed recounted.

For these reasons, it is not unreasonable to conclude that Trigones had a motive at the suppression hearing to cross-examine Weed on the issue of pro-Commonwealth bias similar to the

motive he would have had at trial. True, the stakes at trial would have been higher, but the stakes are almost always higher then (or at least different), and it is clear that in many cases the motive at a preliminary hearing is sufficiently similar to the motive at trial to bring the evidence within the Confrontation Clause's requirements, e.g., Roberts, 448 U.S. at 72-73; California v. Green, 399 U.S. 149, 165 (1970). See generally 5 Weinstein's Federal Evidence § 804.04[5] (J.M. McLaughlin ed., 2d ed. 2002) (stating that "similar motive does not mean identical motive"). In addition, the stakes were also high at the suppression hearing, where, if Trigones had successfully asserted his involuntariness argument, the inculpatory statements could have been kept out altogether. Trigones could only have been helped by showing Weed's bias against him.

The more simplistic characterization -- that Trigones had a motive to paint Weed as truthful at the suppression hearing, but as a liar at trial -- is not necessarily the best characterization because it fails adequately to account for the nuances of Trigones's bias argument. Trigones's argument was never that Weed was a liar. Rather, his argument was that the import of Weed's testimony turned on the small details, those small details were matters of recollection, and Weed's recollection could easily have been tilted against him as a result of Weed's desire to please the Commonwealth and thereby avoid prosecution of himself or his wife as an accessory after the fact to murder. Trigones had a motive to cross-examine Weed on this subtle pro-Commonwealth bias at the

-21-

suppression hearing and would have had a similar motive to cross-examine on this point at trial. It was not unreasonable to conclude that he had a motive to cross-examine on this subject matter at the suppression hearing similar to the motive he would have had at trial.

In light of this conclusion, we hold that the SJC reasonably concluded that Weed's testimony was admissible under the firmly rooted exception to the hearsay rule for prior recorded testimony. This finding alone suffices to reject Trigones's Confrontation Clause challenge and we need not address the SJC's resolution of whether Trigones's pursuit of the bias point would have made a difference.

**IV.**

The Supreme Court's Confrontation Clause cases have sought to accommodate competing interests. Those interests include both allowing the prosecution to present material, reliable evidence and preserving the accuracy of the judicial process through the defendant's exercise of his rights to confront and cross-examine adverse witnesses. The SJC's conclusion that there was no Confrontation Clause violation is within the range of reasonable judgments which may be reached. The state court decision is not an unreasonable application of clearly established federal law, as determined by the Supreme Court.

We _affirm_ the district court order denying the writ of habeas corpus.