PER CURIAM.
Mark Allen Geralds appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habe-as corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the rea *785 sons explained below, we affirm the circuit court’s decision denying relief and deny the petition for writ of habeas corpus.
I. PROCEEDINGS TO DATE
Geralds was convicted and sentenced to death in February 1990 for the first-degree murder of Tressa Lynn Pettibone. Geralds v. State (Geralds I), 601 So.2d 1157, 1158 (Fla.1992). On appeal, we affirmed Geralds’ conviction but, due to trial court errors, remanded for resentencing and a new penalty phase hearing. Id.[1] After the new penalty phase hearing, the jury unanimously recommended death. Geralds v. State (Geralds II), 674 So.2d 96, 98 (Fla.1996). At sentencing, the trial court found three aggravating factors: (1) the murder was committed during the commission of a robbery or burglary or both;[2] (2) the murder was especially heinous, atrocious, or cruel (HAC);[3] and (3) the murder was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification.[4] The court found the statutory mitigator of age[5] but afforded it little weight. The defendant was twenty-two years old at the time of the offense. As for nonstatutory mitigation, the trial court found the following but gave them “very little weight”: (1) the defendant’s love and concern for his daughter and former wife; (2) the defendant came from a divorced family and was unloved by his mother; and (3) the defendant’s antisocial behavior and bipolar manic personality. The trial court determined that the aggravating factors outweighed the mitigating factors and sentenced Geralds to death. On appeal, Geralds raised ten claims.[6] This Court found the application of the CCP aggravating factor was error, but concluded that the error was harmless. Accordingly, we affirmed the death sentence. Id. at 103-04. The United States Supreme Court subsequently denied Geralds’ petition for writ of certiorari. See Geralds v. Florida, 519 U.S. 891, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996).
In September 1997, Geralds filed his original postconviction motion. In January 2002, Geralds amended his motion, raising twenty-six claims.[7] In February *786 2003, after a Huff[8] hearing, the circuit court summarily denied claims 1, 3, 4 (in part), 5, 7, 8 (in part), 9, 10, 11 (in part), 12 (in part), and 13-26. An evidentiary hearing was granted on claims 2, 4 (in part), 6, 8 (in part), 11 (in part) and 12 (in part). Geralds filed a supplement to his postcon-viction motion in July 2004, and a second supplement in July 2005.[9] Both supplements were summarily denied. In January 2006, after evidentiary hearings, the ch’cuit court filed a final order denying Geralds’ postconviction motion. This appeal follows.
II. POSTCONVICTION APPEAL
Geralds challenges the circuit court’s denial of his postconviction motion on several bases. He argues that the circuit court erroneously denied his claims regarding: (A) Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), violations; (B) ineffective assistance of counsel during the guilt and penalty phases; (C) newly discovered evidence of a conflict of interest; (D) some summarily denied claims; (E) a motion to depose a suspect; (F) access to files and records; and (G) the constitutionality of execution by lethal injection. We address each argument in turn below.
A. BRADY/GIGLIO CLAIMS
Geralds argues that the circuit court erred in denying his claim that the State violated Brady when it failed to disclose various reports and information, and Gig-lio when it presented false and misleading testimony. The State argues that the circuit court correctly held that in every instance Geralds either did not establish that the State failed to disclose the evidence or, assuming that the evidence had not been disclosed, Geralds did not establish that he had been prejudiced.
Geralds raises seven Brady claims, which will be addressed first. Geralds also raises five Giglio claims, which will be addressed second.
1. Brady Claims
Claims that the State withheld evidence from the defense are governed by Brady. Under Brady, the State must disclose material information within its possession or control that is favorable to the defense. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidence — either exculpatory or impeaching, (2) was willful *787 ly or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. The determination of whether a Brady violation has occurred is subject to independent appellate review. Davis v. State, 928 So.2d 1089, 1113 (Fla.2005). Giving deference to the circuit court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of suppressed evidence. See Mordenti, 894 So.2d at 169; Way, 760 So.2d at 913.
a. First Brady Claim
As Geralds’ first Brady claim, he argues that the State suppressed a two-page handwritten list with descriptions of jewelry that were missing from the victim’s home.[10] Geralds argues that this list makes clear that the herringbone necklace described in the list was not the necklace that was recovered from a pawn shop.[11] The circuit court denied this claim, holding that Geralds failed to establish that the list was not contained in the State’s supplemental response to demand for discovery, which references 543 pages of investigative material being provided to Geralds on June 1,1989. We agree.
At the evidentiary hearing, Joe Grammer testified that he was one of the assistant state attorneys involved in Ger-alds’ murder prosecution and was responsible for providing discovery. Grammer testified that on June 1, 1989, the State filed a supplemental response to demand for discovery containing approximately 543 pages of investigative material. Grammer further testified that he found a copy of the two-page handwritten list in the State’s supplemental response. Geralds does not identify any portion of the record that contradicts Grammer’s testimony. Thus, the record indicates that Geralds had possession of this list. “[A] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.” Occhicone v. State, 768 So.2d 1037, 1042 (Fla.2000). Accordingly, we hold that Geralds has failed to establish that the circuit court erred in denying this Brady claim.
b. Second Brady Claim
As Geralds’ second Brady claim, he argues that the State suppressed an eight-page report, dated April 3, 1989, written by Shirley Zeigler, a crime laboratory analyst for the Florida Department of Law *788 Enforcement (FDLE).[12] Geralds argues that this report is exculpatory for two reasons: (1) Zeigler’s test results indicated that the blood on a handkerchief discovered at the crime scene did not belong to Geralds or the victim, thus strengthening Geralds’ defense that someone else committed the crime; and (2) Zeigler’s test results indicated that there was no blood on Geralds’ sneakers, which contradicts crime scene analyst Laura Rousseau’s testimony during Geralds’ guilt phase that the sneakers tested positive for blood. The circuit court denied this claim, holding that Geralds failed to establish that the report was not included in the discovery provided by the State on April 14, 1989. We agree.
At best, Geralds has only demonstrated that the record is ambiguous as to whether Zeigler’s report was disclosed. He has not, however, carried his burden of demonstrating that the State suppressed Zeig-ler’s report. In reviewing the State’s discovery produced on April 14, 1989, it is not clear whether Zeigler’s report was included. Although Zeigler is listed as a person known to have information that may be relevant, Zeigler’s report is not specifically identified. At the evidentiary hearing on September 23, 2003, Grammer testified, “I’m absolutely positive that [defense counsel] Bob Adams had this report before he talked to Shirley Zeigler in preparation for the trial.” However, at the evidentiary hearing on February 25, 2004, Grammer testified that he did “not have a clear memory” of providing the report to the defense, but believed that “if we got it, which we did, we shared it with Bob.” In looking at his file marked “lab reports,” Grammer found Zeigler’s report. Gram-mer further testified that the report is the type of document that he would have provided to the defense and that it was possible that if the State did not have it on April 14, 1989, it was given to the defense afterwards. James Appleman, state attorney and Grammer’s co-counsel, testified during the evidentiary hearing that Zeig-ler’s report was available to trial counsel.
Based on this record, the circuit court determined that Geralds failed to establish “that the [Florida Department of Law Enforcement] report was not included in the materials provided April 14, 1989.” “A trial court’s finding after evaluating conflicting evidence that Brady material had been ’disclosed is a factual finding.” Way, 760 So.2d at 911. Therefore, the reviewing court should uphold the finding as long as it is supported by competent, substantial evidence in the record. Accordingly, we hold that Geralds has failed to establish that the circuit court erred in denying this Brady claim.
c. Third Brady Claim
As Geralds’ third Brady claim, he argues that the State suppressed a photograph of a photograph depicting a shoe print from the crime scene. Geralds argued that this shoe print did not match his shoes, which further supports his theory that someone else committed the murder. The circuit court denied this claim, holding that Geralds failed to establish that the photograph of a photograph of a shoe print was not made available to him. We agree.
*789 “In previous cases, this Court has broadly stated that evidence was not ‘suppressed’ where it was equally available to the State and the defense.” Way, 760 So.2d at 911; see also Roberts v. State, 568 So.2d 1255, 1260 (Fla.1990); James v. State, 458 So.2d 786, 790 (Fla.1984). However, the defendants were aware of the exculpatory information in those cases. See Roberts, 568 So.2d at 1260 (noting that defendant was aware of evidence that would show he was under the influence of drugs or alcohol during the crime); James, 453 So.2d at 790 (stating that defendant was aware of existence of photographs contained in confidential juvenile records). A circuit court’s factual finding that a photograph was or was not made available will not be overturned “as long as it is supported by competent, substantial evidence in the record.” Way, 760 So.2d at 911.
At the evidentiary hearing, Grammer testified that “[t]he photographs would not necessarily be turned over but would be made available to defense counsel.” In this case, Geralds did not present any evidence that photographs were not made available or that photographs were made available and this particular print was not included. Accordingly, the circuit court’s finding that Geralds has failed to establish that the photograph of a photograph of a shoe print was not made available to him is supported by competent, substantial evidence and Geralds has not established a Brady violation.
d. Fourth Brady Claim
As Geralds’ fourth Brady claim, he argues that the State suppressed a handwritten note authored by Investigator Bob Jimmerson on January 26, 1990, three days before Geralds’ first trial.[13] Geralds argued that this note is important because it establishes that the State confirmed Geralds’ theory that he legally bought the herringbone necklace from a jeweler named Anthony Swoboda. The State argued, and the circuit court agreed, that Geralds knew of Swoboda’s statement made to Jimmerson because Swoboda was listed as a witness for the defense. Thus, the circuit court denied relief on this claim. We agree.
Swoboda testified at the evidentiary hearing that Geralds’ trial counsel contacted him by phone and in person to confirm the fact that he had sold Geralds some jewelry. Furthermore, Swoboda was listed as a witness for the defense in preparation for trial. Based on this record, the circuit court’s finding that Geralds knew of Swoboda’s statement is supported by competent, substantial evidence. Accordingly, Geralds could not establish a Brady violation because the record supports the circuit court’s finding that Geralds knew of Swoboda’s statement. See Occhicone v. State, 768 So.2d at 1042 (“[A] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.”).
e. Fifth Brady Claim
As Geralds’ fifth Brady claim, he argues that the State suppressed information regarding criminal charges brought against pawnbroker Billy Danford while the case against Geralds was being litigated.[14] Geralds argued that he could have *790 used this information to impeach Danford during the guilt phase of trial. The circuit court held that Geralds failed to establish that there were any deals between the State and Danford, and further, even if this evidence should have been disclosed, there was no prejudice. We agree.
The information introduced at the evi-dentiary hearing regarding Danford’s criminal charges was not admissible and had no impeachment value. This information demonstrates that Danford was charged with a crime, but never convicted. See § 90.610(1), Fla. Stat. (2007) (“A party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime....”) (emphasis added). Geralds suggests that the charges against Danford were dropped because of a “deal” between the State and Danford in exchange for Danford’s testimony against Geralds. However, the only evidence provided at the evidentiary hearing regarding this alleged “deal” is Grammer’s testimony that none had been made. Geralds has not identified any portion of the record that would contradict this testimony. Thus, there is competent, substantial evidence in the record to support the circuit court’s finding that there was no evidence of a “deal” in the record. Furthermore, Ger-alds did not deny at trial that he pawned a herringbone necklace on the day the victim was murdered. Instead, he only argued that the necklace he pawned was sold to him by his pawnbroker friend, Swoboda, and that Danford’s testimony did not portray Geralds as a person who had just committed a murder. Danford’s trial testimony is entirely consistent with Geralds’ theory. At trial, Danford identified Ger-alds as the person who pawned a herringbone necklace on the day the victim was murdered. Accordingly, even if the information regarding Danford’s criminal charges were admissible as impeachment evidence, Danford’s testimony does not contradict Geralds’ theory of the case. Consequently, Geralds was not prejudiced by not being able to impeach Danford with information regarding the criminal charges.
f. Sixth Brady Claim
As Geralds’ sixth Brady claim, he argues that the State suppressed an exculpatory interview that occurred between Investigator Jimmerson and Greg Toriac two days before Geralds’ trial began. Toriac worked at Club LaVela in Panama City Beach, the city where the murder took place. Geralds argued that the substance of the interview contradicts the alibi of William Pelton (Toriac’s coworker and a suspect early in the case) and could have been used to argue that Pelton committed the murder.[15] The circuit court denied *791 this claim, holding that Geralds knew of Toriac and that there was no Brady violation as to this exhibit. We agree.
First, the interview has no favorable evidentiary value to Geralds. Geralds is attempting to establish that Pelton murdered the victim. He argues that he can establish this by showing the jury that Pelton was not at work at Club LaVela on the day of the murders, which was Pelton’s alibi. In the interview, Toriac states that he, like the manager of the club, would not know whether Pelton was at work on the day of the murder. Indeed, Geralds candidly admits when arguing this point under his Giglio claim below that “Jimmerson’s interview notes ... indicate that no one was certain whether Mr. Pelton was at work on the morning of February 1,1989.”
Second, Geralds failed to establish that information regarding this interview was suppressed. At the evidentiary hearing, Grammer testified that the information about Pelton being away from work was part of discovery. Additionally, Toriac was listed as a witness for the defense and in the defense praecipe for subpoena.
Third, Geralds has not established that he was prejudiced. Even if Toriac would have testified to the exact information he gave at the interview, his testimony would not discredit Pelton’s alibi. In the interview, Toriac merely states that he does not know whether Pelton was at work on the day of the murders. Geralds fails to establish how this testimony would have undermined confidence in the outcome of his trial. Accordingly, the circuit court did not err in holding that there was no Brady violation as to this interview.
g. Seventh Brady Claim
As Geralds’ seventh Brady claim, he argues that the circuit court failed to address several pieces of evidence that were admitted during the evidentiary hearing and alleged to have been suppressed. Specifically, Geralds argues that the- court ignored Exhibit 11, which is a handwritten note by Investigator Jimmer-son indicating that he recovered a pawn ticket from Geralds six days after the herringbone necklace was recovered. Geralds argues that this evidence is inconsistent with Jimmerson’s testimony that he obtained the pawn ticket the day the necklace was recovered. Geralds further argues that the court ignored Exhibits 31, 34, and 36, which consist of notes regarding the location of finger and palm prints lifted from the crime scene and the victim’s automobile, the reports, and the notes of hair analysis. Finally, Geralds argues that the court ignored evidence that the State suppressed other handwritten notes by Jimmerson regarding his initial interview with the victim’s husband. Geralds fails to identify which exhibits involve this latter information. Although the trial court did not specifically address these pieces of evidence in its order, we deny relief because the record supports the conclusion that Geralds failed to demonstrate either that the information was suppressed by the State or that the information was material. Thus, Brady error has not been demonstrated.
2. Giglio Claims
Claims that the State knowingly presented false or misleading testimony are governed by Giglio, 405 U.S. 150, 92 S.Ct. 763. A claim under Giglio alleges that a prosecutor knowingly presented false testimony against the defendant. A Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the *792 false evidence was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury’s verdict. Id. Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id.; see also Mordenti, 894 So.2d at 175. Thus, the standard applied under the third prong of the Giglio test is more defense-friendly than the test set out in Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936, which is applied to a violation under Brady. Giglio claims present mixed questions of law and fact. Sochor v. State, 888 So.2d 766, 785 (Fla.2004). We thus defer to those factual findings supported by competent, substantial evidence, but we review de novo the application of the law to the facts. Id.
a. First Giglio Claim
As Geralds’ first Giglio claim, he argues that the State allowed crime scene analyst Rousseau to testify falsely when she stated that she tested Geralds’ sneaker and it “came up positive for presumptive testing for blood.” Geralds argued that the State failed to reveal that when the sneakers were tested by FDLE analyst Zeigler, Zeigler did not find the presence of blood. Geralds concluded that the State violated Giglio by allowing Rousseau to testify as she did while possessing Zeig-ler’s report.
We deny relief because error has not been demonstrated. Geralds has failed to show how the Zeigler report makes Rousseau’s testimony false or misleading. Rousseau conducted her own test on the sneakers, and she testified concerning her results, not the results from any other testing.
b. Second-Fifth Giglio Claims
Geralds’ second through fifth Gig-lio claims all relate to Investigator Jim-merson’s testimony, which was presented during the resentencing phase. Geralds argued that the prosecutor violated Giglio during resentencing when Investigator Jimmerson testified that (1) Pelton’s alibi had been confirmed, (2) the shoeprints found at the crime scene were similar to Geralds’ sneakers, (3) one of Geralds’ shoes tested positive for blood, and (4) the lab determined that blood found on the herringbone necklace belonged to the victim. The circuit court denied these claims, holding that Jimmerson’s testimony at the resentencing did not constitute a Giglio violation. We agree.
At resentencing, Jimmerson testified that he verified that Pelton was at work on the date of the murder. There is nothing in the record indicating that Jimmerson did not confirm Pelton’s alibi, and Geralds did not present any evidence at the eviden-tiary hearing to the contrary. Geralds relies on Jimmerson’s interview with Tori-ac, raised as his sixth Brady claim, and argues that this interview indicates that no one was certain whether Pelton was at work on the morning of the murders. This interview only indicates that Toriac, not Jimmerson, did not confirm Pelton’s alibi. At resentencing, Jimmerson also testified that he saw one consistent shoe track throughout the victim’s home that came from the same type of shoe that belonged to Geralds. Jimmerson testified to what he observed. In his observation, he saw only one consistent shoe track. Jimmerson also testified at resentencing that he was present when Geralds’ shoes were tested for the presence of blood and that one of the shoes tested positive. Again, Jimmerson testified to what he personally observed, and Geralds failed to present any evidence indicating that this *793 testimony was false. Finally, the record does not support Geralds’ argument that Jimmerson testified that the blood found on the herringbone necklace belonged to the victim. Instead, Jimmerson testified at resentencing that the laboratory determined that the blood type on the necklace matched the victim’s type. Accordingly, there is competent, substantial evidence to support the circuit court’s determination that this testimony was not inaccurate or untrue.
B. INEFFECTIVE ASSISTANCE OF COUNSEL
Geralds argued before the circuit court that his trial counsel, Bob Adams, was ineffective during the guilt phase and the penalty phase. While the same standard of law applies to each claim, the guilt phase and the penalty phase arguments will be analyzed separately.
In order to establish a claim for ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
There is a strong presumption that trial counsel’s performance was not ineffective. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id. In Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000), we explained that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
1. Guilt Phase
Geralds raises four categories of allegedly deficient performance during the guilt phase, including counsel’s failure to (a) present evidence from the crime scene; (b) cross-examine witnesses; (c) investigate and present witnesses; and (d) make objections and proper motions. The circuit court denied this claim, holding that (1) trial counsel’s final argument during the guilt phase addressed the issues Geralds raised; (2) trial counsel followed a strategy focusing on the circumstantial nature of *794 the evidence and the lack of definite evidence linking Geralds to the crime; (3) trial counsel adequately and effectively cross-examined the State’s witnesses; (4) Geralds failed to demonstrate what additional information would be revealed if trial counsel had hired an investigator; and (5) Geralds did not establish that counsel’s performance was so deficient as to amount to ineffective assistance of counsel as to any of the claims he made,
a. Evidence from the Crime Scene
Geralds argues that trial counsel should have presented evidence related to the physical evidence, or lack thereof, obtained from the crime scene and the victim’s body. After the State rested its case at trial, the defense moved for a judgment of acquittal based on the insufficiency of the evidence. When the motion was denied by the court, the defense rested its case without calling any witnesses or presenting any evidence.
Because trial counsel is deceased, he was not able to testify at the evidentiary hearing regarding his trial strategy. Nevertheless, a review of his closing argument during Geralds’ guilt phase suggests that trial counsel’s strategy was to highlight all the missing pieces of evidence in order to create a reasonable doubt. We agree with the circuit court’s summary of trial counsel’s closing argument and hold that trial counsel’s performance was not deficient, because his closing argument during the guilt phase addressed the evidentiary issues Geralds raised in his postconviction motion. In denying this claim, the circuit court noted the following facts from the record:
On page 79 of Volume III of the guilt phase transcript (page 1982) trial counsel called the jurors’ attention to what they did not hear in the case. He specifically argued the lack of evidence on page 81 (page 1984) and trial counsel reminded the jurors that the sunglasses and gold chain only looked like the victim’s. He also argued there was no way to tell what things were actually taken due to Carolyn Pettibone gathering up some jewelry before the family came back from Ohio. On page 90, [ Qpage 1993) he also pointed out that there was only presumptive tests for blood made by Laura Russo [on Geralds’ sneakers]. He questioned the lack of presence of blood in the car. On page 92 he argued the stain in the back seat could mean more than one individual was involved and the one who was bloody got in the back seat (page 1995). He also questioned the failure to show that a contact lens found on the victim actually belonged to the victim. He again pointed out that a prescription check could reveal if the lens could have belonged to another person who lost it in the struggle. On page 95 he pointed out the lack of testimony about the defendant’s clothes being bloody and the lack of scratches on his face. He argued the importance of this when compared to the fingernail torn off on the victim’s hand. On pages 97-98, trial counsel commented on the fact that the Thomas ties were not uncommon and that one of the ties in Geralds’ trunk was not a Thomas tie. On page 99, he argued about the failure to pursue other suspects and how that was a lack of evidence (page 2002). He further argued the lack of blood on the Nike shoes and the fact that the tread designs were not uncommon. He argued that the pawning of the necklace and the giving of your identification without any attempt to disguise yourself was inconsistent with a guilty conscious [sic]. He also pointed out that Bill Dan-ford did not see any scratches, bruises or hurt knuckles (page 2007). He pointed out to the jurors the various samples taken from Geralds and why none were *795 found at the scene. He questioned the lack of evidence as to anything under the fingernails of the victim and the fibers on a corner of the residence in the interior. He pointed out to the jury that the defense requested DNA testing on the necklace and why didn’t the State do it itself. On rebuttal, trial counsel again argued the lack of evidence. He argued where were certain witnesses and this was really a case of coincidence. All of these arguments by trial counsel refute the claims of the defendant that his trial counsel was not prepared and was deficient in his performance.
Geralds does not deny that trial counsel argued these points during closing argument. Instead, he argues that trial counsel should have presented evidence of this lack of evidence instead of merely arguing in closing that there was no evidence.
Even though closing argument is not evidence, it is a powerful tool.[16] Through his closing argument, trial counsel was able to highlight the lack of evidence and characterize the State’s case as a failure to properly investigate and present the entire picture. For example, when highlighting the lack of evidence regarding to whom the torn fingernail belonged, trial counsel argued, “Either they [ (the State) ] didn’t check or it didn’t match up with Mark Geralds. And they want you to guess a man into a guilty verdict in a case this terrible.” Lynn Henson, a microana-lyst for FDLE, analyzed the fingernail and concluded that it belonged to the victim. Geralds makes no argument that trial counsel was not aware of this report. Had counsel presented Henson’s analysis, he could not have argued that the State failed to present evidence that it had fully investigated and tested the evidence, such as the fingernail. Other than stating what trial counsel should have done differently, Geralds does not establish why trial counsel’s strategy was deficient. When held up against the strong presumption that trial counsel’s performance was not ineffective, Geralds has failed to carry his burden. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052.
Furthermore, even if trial counsel’s performance was deficient for not presenting this evidence, Geralds fails to establish how he was prejudiced. Trial counsel referenced the lack of evidence in closing argument and the jury was aware of it. Accordingly, the failure to actually present evidence of non-evidence in this case could not have affected the fairness and reliability of the proceeding so that confidence in the outcome is undermined.
b. Cross-Examining Witnesses
Geralds argues that trial counsel should have cross-examined Blyth and Bart Pettibone, the victim’s children, to show that their testimony evolved over a period of time. Specifically, Geralds argues that trial counsel should have cross-examined Blyth and Bart on the fact that they did not tell the police that they en *796 countered Geralds until after Geralds was arrested. Blyth was in the ninth grade when she testified. Bart was nine years old when he testified. Through Blyth and Bart, the jury heard evidence that one week prior to the murder, Blyth, Bart, and the victim encountered Geralds in a shopping mall and Geralds learned that the victim’s husband was out of town. Blyth was cross-examined while Bart was not. Trial counsel questioned Blyth regarding Judy Lundmark, the victim’s housekeeper, who reportedly had a key to the home. Counsel also questioned Blyth regarding the fact that she and at least three other family members went through the victim’s possessions after the murder. Counsel was also able to obtain a concession from Blyth that she could not conclusively identify the herringbone necklace. The circuit court held that trial counsel’s performance on this point was not deficient. We agree.
First, Geralds does not identify any reason why the children should have told police that they encountered Geralds in the mall until after he was arrested. Second, trial counsel could have been exercising restraint in cross-examining these witnesses because they are children. Trial counsel could have reasonably believed that the jury would penalize Geralds for allowing trial counsel to strenuously cross-examine the victim’s children. In Brown v. State, 846 So.2d 1114 (Fla.2003), we rejected an argument that trial counsel should have cross-examined a witness on certain issues, or more strenuously examined him on certain issues, because such an argument “is essentially a hindsight analysis.” Id. at 1121. “The standard is not how present counsel would have proceeded, in hindsight, but rather whether there was both a deficient performance and a reasonable probability of a different result.” Id. (quoting Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995)). Similarly, we hold that Geralds’ argument is essentially a hindsight analysis and that trial counsel’s performance was not deficient in this regard.
Nevertheless, even if trial counsel was deficient for not cross-examining these children any further, Geralds fails to establish how he was prejudiced. Geralds does not make the connection as to how cross-examining these witnesses any further on the point he raises would undermine confidence in the outcome. Accordingly, Geralds fails to establish that he was prejudiced.
c. Investigating and Presenting Witnesses
Geralds argues that if trial counsel had properly investigated the case, he could have shown the jury that the Thomas Industries plastic ties that were discovered are very common among individuals involved in the construction industry, such as Geralds and the victim’s husband.[17] Geralds also argues that trial counsel could have presented Swoboda’s testimony to corroborate Geralds’ statement that he possessed the herringbone necklace prior to the crimes. Although the circuit court addressed Geralds’ argument that trial counsel did not adequately investigate the case, this ruling was in the context of mitigation evidence presented during the penalty phase.
Nonetheless we deny relief because Ger-alds has failed to establish that trial counsel’s performance was deficient with respect to the investigation of the plastic tie. Clifford W. Hutchinson, project engineer for Thomas Industries, testified that the plastic tie used to bind the victim was made by the company he worked for, *797 which is the same company that made the plastic ties found in Geralds’ trunk. Trial counsel cross-examined Hutchinson regarding how many ties Hutchinson’s company produced, and Hutchinson estimated that it was somewhere between thirty and one hundred thousand. In closing argument, trial counsel commented on the fact that the plastic ties were common. Thus, trial counsel informed the jury of the plastic tie’s common use.
Further, even if trial counsel should have presented more evidence that the plastic ties were in common use, Geralds fails to establish prejudice. Trial counsel informed the jury of the widespread use of the plastic ties in closing argument and the jury returned a guilty verdict. Furthermore, Geralds fails to establish how this evidence would have undermined confidence in the outcome when there was other evidence linking him to the crime, such as the victim’s blood type matching a blood stain on the necklace he pawned. See Geralds I, 601 So.2d at 1158-59.
With respect to Swoboda, Geralds has not shown that counsel acted deficiently in failing to present his testimony. At the evidentiary hearing, Swoboda testified that he sold Geralds a herringbone necklace. Geralds argues that this evidence would establish that the necklace he pawned is not the one that belonged to the victim. However, even if Swoboda had testified at trial that he sold Geralds a herringbone necklace, Geralds fails to explain how the victim’s blood type appeared on the necklace that he pawned. Thus, Swoboda’s testimony would not have helped Geralds.
Nevertheless, even if trial counsel was deficient for not presenting Swoboda’s testimony, Geralds fails to establish prejudice. Swoboda’s testimony does nothing to discredit the fact that Geralds pawned a necklace that was identified as belonging to the victim and had a blood stain matching the victim’s blood type. At best, Swoboda’s testimony only establishes that Geralds purchased an unrelated herringbone necklace at a time unrelated to the murder. Accordingly, Geralds fails to establish that this evidence would undermine confidence in the outcome of the trial,
d. Making Objections and Proper Motions
Geralds argues that trial counsel failed to object to the State’s closing argument that Geralds wore gloves to conceal his fingerprints.[18] Geralds further argues that the gloves he wore did not have any material over the upper portion of his fingertips, which would prevent him from leaving prints.
We deny relief because Geralds does not establish how the prosecutor’s comment undermines confidence in the outcome of the trial. Indeed, Geralds does not make any arguments on how this comment undermines the evidence linking him to the crime. Accordingly, Geralds fails to establish that this evidence undermines confidence in the outcome of the trial.
2. Penalty Phase
Geralds argues that trial counsel was ineffective for failing to investigate and present sufficient mitigating evidence at Geralds’ resentencing. At the postcon-viction hearing, Geralds presented the testimony of James E. Beller, the psychotherapist who testified on Geralds’ behalf during resentencing. Geralds argued that Beller’s testimony at the postconviction hearing establishes that Beller’s diagnosis *798 was not supported by sufficient evidence and that additional investigation revealed that Geralds suffered from attention deficit hyperactivity disorder (ADHD) and depression as a child. Geralds further argues that trial counsel failed to develop or present evidence regarding Geralds’ childhood difficulties and early mental health problems, his family dysfunction, and his life of isolation. The State argues, and the circuit court agreed, that Beller’s testimony did not change at the evidentiary hearing. The postconviction court further noted that trial counsel conducted an investigation and presented mitigating evidence at the second penalty phase. We agree and hold that trial counsel’s performance at Geralds’ resentencing does not constitute ineffective assistance of counsel.
Beller’s testimony at Geralds’ resentenc-ing was not significantly different from the testimony he gave at the evidentiary hearing. At resentencing, Beller testified that he diagnosed Geralds as “an anti-social personality disorder and bi-polar disorder manic.” Beller testified that he came to this conclusion after administering five different tests and conducting an interview. He saw Geralds once for testing and once for a two-hour therapy session. Beller further testified that Geralds was depressed due to family issues and suffered from anxiety. As a child, Geralds became significantly depressed and lonely. On cross-examination, Beller testified that he did not talk to any of the investigating officers or to Geralds’ family or friends in preparing for his testimony.
At the evidentiary hearing, Beller testified that he did not change his opinion on whether Geralds was bipolar or antisocial. Furthermore, Beller testified that he felt that he was prepared to testify when he testified during Geralds’ resentencing. Beller also admitted that the testing conducted for the evidentiary hearing came out identical to the testing conducted for the resentencing.
There were two differences between Beller’s evidentiary and resentencing testimony. First, Beller interviewed two family members and one friend, and these contacts led Beller to believe that Geralds would have been diagnosed as ADHD when he was a child. Second, Beller administered the Psychopathy Check List Revised test (PCLR).
With respect to the two family members and one friend, Geralds does not present any evidence that he told his trial counsel about these contacts or that trial counsel should have been aware of them. In fact, these contacts are not even identified by name in the record — they are only referred to as “two family members and one friend.” Accordingly, Geralds fails to establish that trial counsel’s performance was deficient for failing to discover these unidentified contacts. Geralds also fails to establish prejudice on this issue. Beller admitted that Geralds told Beller about his background information and family history for the resentencing. Indeed, Beller admitted that the information Geralds gave was “remarkably similar” to the information learned from these two family members and one friend.
With respect to the PCLR test, Beller admitted that this test was not available at the time of Geralds’ resentencing because it had not been developed yet. Accordingly, even assuming that psychological tests are something that trial counsel should investigate, trial counsel cannot be deficient for failing to investigate a test that did not exist.
Accordingly, Geralds fails to establish how trial counsel was ineffective during *799 the penalty phase.[19]
C. NEWLY DISCOVERED EVIDENCE OF A CONFLICT OF INTEREST
Geralds argued before the circuit court that newly discovered evidence establishes a conflict of interest between the Public Defender’s Office and the State Attorney’s Office that deprived him of his right to a fair trial. Specifically, Geralds relied on an evidentiary hearing in an unrelated case to show the existence of an agreement between the Public Defender and the State Attorney to not call Dr. William Sybers, the medical examiner who testified during Geralds’ guilt phase, so that Dr. Sybers could not be impeached regarding the active investigation of Dr. Sybers’ involvement in the death of his wife. Both offices allegedly agreed that the State would call other experts to testify as to the manner and cause of death. At resentencing, Dr. James Lauridson testified as to the manner and cause of death while using Dr. Sybers’ materials.[20]
A legally sufficient claim of newly discovered evidence must establish two elements. First, the evidence must not have been known by the trial court, the party, or counsel, and it must appear that the defendant or defense counsel could not have known of it by the use of due diligence. Jones v. State, 709 So.2d 512, 521 (Fla.1998). Second, the evidence must be of such nature that it would probably produce an acquittal or yield a less severe sentence on retrial. Id.
We reject Geralds’ argument that a conflict of interest exists because Geralds has failed to present any evidence whatsoever that his attorney was part of any alleged agreement between the Public Defender and the State Attorney. In fact, the record reflects that defense counsel strenuously objected to the State calling Dr. Lauridson as a witness to testify using Dr. Sybers’ materials. The circuit court correctly noted this point, stating that “Adams’ actions do not support a finding that he honored the terms of any such agreement if it did, in fact, exist.” Accordingly, the circuit court did not err in denying this claim.
D. SUMMARILY DENIED CLAIMS
Geralds argues that the postconviction court erred in summarily denying the first and second supplement to his postconviction motion, various claims of ineffective assistance of counsel contained in his amended postconviction motion, and a newly discovered evidence claim in his amended postconviction motion. We conclude that the circuit court did not err in summarily denying these claims.
In determining whether an evidentiary hearing is required, we have held:
[A] defendant is entitled to an evidentia-ry hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. The defendant bears the burden of establishing a prima *800 facie case based upon a legally valid claim. Mere eonclusory allegations are not sufficient to meet this burden. However, in cases where there has been no evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record.
Hannon v. State, 941 So.2d 1109, 1138 (Fla.2006) (quoting Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000)). This standard must be applied to each of Geralds’ claims that summary denial was improper.
1.First and Second Supplements
In both supplements, Geralds argued that he had learned of other suspects involved in the murder investigation. He alleged that either the State violated Brady when it failed to disclose this exculpatory evidence or trial counsel was ineffective for failing to present it to the jury. The circuit court summarily denied this claim, holding that there were no specifics contained in the supplement sufficient to establish that this information should have been disclosed or, if it was required to be disclosed, that it would have any prejudice on the defense by the failure to disclose it. The circuit court further held that there were no allegations that this information was available to trial counsel and that he had failed to act on it. We agree.
In his supplements, Geralds identified other suspects in this case and the details of why they were suspected. In addressing these suspects, however, Geralds merely provided facts and failed to allege any of the proper elements of a Brady or ineffective assistance of counsel claim. Geralds bears the burden of establishing a prima facie case based upon a legally valid claim. Freeman, 761 So.2d at 1061. The fact that others were suspected of committing this crime, without more, is insufficient to establish a legally sufficient Brady claim. With respect to the ineffective assistance of counsel aspect of this claim, Geralds also fails to allege that trial counsel knew of, or failed to act on, any information regarding other suspects. Accordingly, the circuit court did not err in summarily denying these claims because Geralds’ eon-clusory allegations failed to establish a legally sufficient Brady or ineffective assistance of counsel claim.
2.Ineffective Assistance of Counsel
Geralds argues that the circuit court erred in summarily denying some of his ineffective assistance of counsel claims. Specifically, he argues that the circuit court erred in summarily denying his claim that trial counsel failed to (a) prevent the prosecutor from reading testimony from the previous trial into the record; (b) object or correct Jimmerson’s summary of evidence presented during the guilt phase; (c) subject the penalty phase testimony to an adversarial testing; and (d) object to improper prosecutorial comments. A review of Geralds’ allegations reveals that Geralds has not met his burden of alleging a legally sufficient claim. See Freeman, 761 So.2d at 1061. Specifically, Geralds fails to establish how any of these alleged instances of ineffective assistance of counsel prejudiced him. Accordingly, the circuit court did not err in summarily denying these claims.
3.Newly Discovered Evidence
Geralds also argues that the post-conviction court erred in summarily denying his newly discovered evidence claim that Dr. Lauridson testified falsely at his resentencing. Geralds directs this Court’s attention to a letter from Dr. Lauridson to Assistant State Attorney Steve Meadows in which Dr. Lauridson states that Dr. Sybers made a mistake in his calculations in a case unrelated to Geralds’ case. Based on this letter, Geralds concludes *801 that Dr. Lauridson testified falsely in the unrelated case and therefore testified falsely in his case. The circuit court summarily denied this claim, holding that Ger-alds’ allegations were insufficient and eon-clusory and that he failed to establish prejudice. We agree.
In the instant case, Geralds fails to establish both elements of a legally sufficient claim of newly discovered evidence. See Jones, 709 So.2d at 521. First, Geralds has not alleged how or when he discovered Dr. Lauridson’s letter. Second, Geralds fails to establish how Dr. Lauridson’s letter would probably produce an acquittal or yield a less severe sentence on retrial. In fact, Geralds has not established that the letter would even be admissible in evidence or as impeachment material. Accordingly, we hold that the circuit court did not err in summarily denying this claim.
E. MOTION TO DEPOSE A SUSPECT
During postconviction proceedings, Ger-alds filed a motion to depose Bob Wil-loughby, a former Bay County Sheriff’s officer, alleging that Willoughby had interviewed Warren Cash, a suspect in the murder case, and that Willoughby would not speak to the defense about this interview without a subpoena. Geralds’ second supplement to his postconviction motion was filed simultaneously with this motion to depose Willoughby. In the supplement, Geralds raised a Brady claim, alleging that the State failed to disclose the information regarding Cash. The State argued that the motion should be denied because Geralds’ Brady claim regarding Cash as a suspect should be denied. The postconviction court denied the motion to depose without discussion.
The denial of a motion to depose a witness is reviewed for an abuse of discretion. Doorbal v. State, 983 So.2d 464, 482 (Fla.2008). “Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.” State v. Coney, 845 So.2d 120, 137 (Fla.2003) (quoting White v. State, 817 So.2d 799, 806 (Fla.2002)). We have already held that the circuit court did not err in summarily denying Geralds’ Brady claim regarding other suspects, which included Geralds’ allegations regarding Cash as a suspect. Accordingly, we conclude that because Geralds failed to raise a proper Brady claim regarding Cash as a suspect, the circuit court did not abuse its discretion in denying his motion to depose Wil-loughby.
F. ACCESS TO FILES AND RECORDS
Geralds raises three claims relating to his public records requests pursuant to Florida Rule of Criminal Procedure 3.852. “A circuit court’s ruling on a public records request filed pursuant to a [post-conviction] motion will be sustained on review absent an abuse of discretion.” Coney, 845 So.2d at 137.
First, Geralds argues that the State Attorney did not provide handwritten trial notes. State Attorney Joe Grammer testified during the evidentiary hearing that although trial notes were not disclosed, he did not know whether trial notes even existed. Based on this testimony, Geralds argued that he was denied access to public records because the State did not produce its trial notes. Even if the documents existed, Geralds has not presented a legally sufficient claim. The State’s trial notes are not public records subject to disclosure. See, e.g., Johnson v. Butterworth, 713 So.2d 985, 986-87 (Fla.1998) (finding state attorney’s outline *802 of evidence, a proposed outline for trial, and handwritten notes were not public records); Bryan v. Butterworth, 692 So.2d 878, 880-81 (Fla.1997) (finding legal pads regarding Attorney General’s impressions and strategy, sheets summarizing psychological reports prepared by paralegal for later use by the Attorney General, and annotated map prepared by Attorney General were not public records). Accordingly, we hold that the circuit court did not abuse its discretion in denying this public records request.
Second, Geralds argues that in response to a December 1998 public records request the Panama City Police Department (PCPD) produced only printouts indicating whether individuals had a criminal record, but not the criminal record itself. Geralds’ demand for additional public records requested “[a]ny and all files (regardless of form ...) related to any matter in which the below named individuals were the subject of an investigation, accused, charged and/or convicted of a crime, and/or was a witness suspect or victim.” Forty-nine .witnesses were listed without any other specific information. This Court has “consistently held that a defendant must plead with specificity the outstanding public records he seeks to obtain.” Rodriguez v. State, 919 So.2d 1252, 1273 (Fla.2005); see also Thompson v. State, 759 So.2d 650, 659 (Fla.2000). The instant records request is similar to the one made in Rodriguez, which this Court held was “unduly broad and vague.” Rodriguez, 919 So.2d at 1273 & n. 11. Indeed, the circuit court in the instant case found the same records request to be unduly broad and vague when the FDLE objected. Accordingly, we hold that the circuit court did not abuse its discretion in denying this public records request.
Finally, Geralds argues that the circuit court erred when it held that Ger-alds was required to provide more information regarding the individuals listed in a public records request in order to determine whether the request was relevant. In July 2001, Geralds filed an affidavit demanding additional public records from the Bay County Sheriffs Office, FDLE, PCPD, and the State Attorney of the Fourteenth Judicial Circuit. The requests sought “[a]ny and all files, records, reports, rap sheets, letters, memoranda, notes, drafts, electronic mail and/or files, and all other records (regardless of form) in the possession or control of your agency relating to the individuals named below, regardless of facility, office, unit or branch of your agency where records may be housed.” Geralds listed approximately forty-eight names in each request, and the names were broken up into categories, such as individuals who had been investigated for homicide and individuals who had provided statements about the crime. Some entries on the list were accompanied by aliases, dates of birth, social security numbers, last known addresses, or race, while others just listed a name. FDLE and PCPD objected, arguing that Geralds listed numerous individuals with little to no identifying information, and that the request was overly broad and unduly burdensome. The circuit court agreed in part and ordered Geralds to provide additional identifying information on the persons listed, holding that “persons listed by name in the 3.852(i) requests are relevant if accompanied by identifying information.”[21] The circuit court reasoned that if Geralds *803 could only provide a name, without anything else, the relevance of the name was questionable. As for the respondents, the circuit court ordered compliance with the requests that had sufficient identifying information. Based on this record, Geralds has failed to establish how the circuit court abused its discretion or acted arbitrarily or unreasonably. Without additional identifying information on the persons Geralds merely named, the request is similar to Geralds’ December 1998 request, which, as noted above, was unduly broad and vague. Accordingly, we hold that the circuit court did not abuse its discretion in denying this public records request.
G. CONSTITUTIONALITY OF EXECUTION BY LETHAL INJECTION
Geralds challenges the constitutionality of Florida’s lethal injection procedure and alleges that it constitutes cruel and unusual punishment. This argument was rejected by this Court in Lightbourne v. McCollum, 969 So.2d 326 (Fla.2007), cert. denied, 553 U.S. 1059, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008), and Schwab v. State, 969 So.2d 318 (Fla.2007), cert. denied, 553 U.S. 1059, 128 S.Ct. 2486, 171 L.Ed.2d 777 (2008).
Geralds does not assert that he would have presented any additional testimony or other evidence regarding the lethal injection procedures than what was presented in Lightboume or Schwab. Furthermore, Geralds does not rely on any new evidence as to the chemicals employed since this Court’s previous rulings rejecting this challenge or the United States Supreme Court’s decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), in which a majority of the Court upheld the constitutionality of Kentucky’s lethal injection protocol against an Eighth Amendment challenge. As this Court stated in Schwab, “[g]iven the record in Lightboume and our extensive analysis in our opinion in Lightbourne v. McCollum, we reject the conclusion that lethal injection as applied in Florida is unconstitutional.” Schwab, 969 So.2d at 325. We hold, therefore, that the circuit court did not err in summarily denying this claim.
III. PETITION FOR WRIT OF HABEAS CORPUS
Geralds has also filed a petition for writ of habeas corpus in this Court raising two categories of claims. In the first category, Geralds raises five claims of ineffective assistance of appellate counsel. In the second category, Geralds argues that this Court erred when it failed to remand for an additional resentencing after it struck an aggravating circumstance in Geralds II. Each category will be addressed in turn below.
A. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at *804 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). “If a legal issue “would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)). This is also generally true as to issues that would have been found to be proeedurally barred had they been raised on direct appeal. Id.
1. Hearsay
In his first claim of ineffective assistance of appellate counsel, Geralds argues that certain hearsay statements admitted during the resentencing phase of his trial violated his right to confront witnesses under the Sixth Amendment of the United States Constitution.[22] Geralds argues that the circuit court erred in allowing the State to read the testimony of Billy Dan-ford and Vicky Ward into the record, and appellate counsel was ineffective for failing to raise this issue on appeal. Geralds also argues that five portions of the resentenc-ing testimony of lead investigator Bob Jimmerson violated his right to confrontation, and appellate counsel was ineffective for failing to challenge this testimony on appeal.
At the time of Geralds’ direct appeal from his resentencing, the United States Supreme Court had held that the Confrontation Clause was not violated if the witness was unavailable and the evidence was admitted within a firmly rooted hearsay exception or there were particular indicia of reliability. See Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Idaho v. Wright, 497 U.S. 805, 816, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).[23]
The first of Geralds’ allegations concerns the testimony of Billy Danford and Vicky Ward, which were read into the record after the trial court determined that these witnesses were unavailable for the resentencing proceeding. Geralds argues that the trial court erred in allowing the State to read the testimony into the record, and appellate counsel was ineffective for failing to raise this issue on appeal. Geralds does not dispute the trial court’s ruling that these witnesses were unavailable. Nor does he dispute that he had a prior opportunity to cross-examine these witnesses during their testimony at his *805 first trial. Instead, he argues that this testimony was presumptively unreliable hearsay. We reject this argument because Danford’s and Ward’s testimony qualified as former testimony,[24] which is a firmly rooted and reliable hearsay exception. Richardson v. State, 247 So.2d 296, 300 (Fla.1971) (“A time-honored and universally recognized exception to the hearsay rule is the so-called ‘former testimony5 exceptions.”).[25] By qualifying as former testimony under section 90.804(2)(a), Danford’s and Ward’s testimony is not vulnerable to a Confrontation Clause challenge. Cf. Trigones v. Bissonnette, 296 F.3d 1, 7 (1st Cir.2002) (“[E]vidence admissible under Rule 804(b)(1) is, ‘by definition, not vulnerable to a challenge based upon the Confrontation Clause.’ ”) (quoting United States v. McKeeve, 131 F.3d 1, 9 (1st Cir.1997)). Accordingly, we conclude that appellate counsel cannot be deemed ineffective for failing to challenge the admission of these hearsay statements on appeal.
The second of Geralds’ allegations concerns five portions of the testimony of lead investigator Bob Jimmerson during resentencing, wherein Jimmerson allegedly testified to matters that he learned through hearsay. Geralds argues that his right to confrontation was violated when (1) Jimmerson testified that the plastic ties recovered from the scene and the ties recovered from Geralds’ trunk were Thomas Industry ties; (2) Jimmerson testified that there was one consistent shoeprint throughout the house; (3) Jimmerson testified that luminol testing conclusively indicated the presence of blood and that one of Geralds’ shoes tested positive for blood; (4) Jimmerson testified that the blood on the necklace “was of’ the victim; and (5) Jimmerson related the testimony of Ger-alds’ grandfather when he testified that Geralds was wearing gloves.
Although trial counsel objected in some instances, trial counsel never objected on the basis of hearsay or the Confrontation Clause. Thus, Geralds must demonstrate that error, if any, was fundamental in order to show that appellate counsel was ineffective in failing to raise these claims on appeal. Fundamental error is error that reaches down into the validity of the trial itself to the extent that the jury’s verdict could not have been obtained without the assistance of the alleged error. Anderson v. State, 841 So.2d 390, 403 (Fla.2003). In each instance, Geralds has failed to argue how Jimmerson’s testimony constituted fundamental error. Accordingly, appellate counsel cannot be deemed ineffective for failing to raise these unpre-served claims on appeal.
2. Prosecutorial Comments
Geralds argues that the State made improper comments during his resentencing, and appellate counsel was ineffective for *806 failing to raise them as error on appeal. Geralds groups the comments into those that trial counsel objected to and those to which trial counsel raised no objection.
In the first category, Geralds argues that the State made inappropriate comments during voir dire. Specifically, he argues that the State inappropriately listed the aggravating and mitigating circumstances applicable to Geralds’ case. During voir dire, the State noted, “I anticipate that the Court may say something along this line about what the aggravating circumstances are.” Without giving any specific facts, the State then described the aggravators of flight after a robbery or burglary and of avoiding arrest. Defense counsel objected and the trial court held a sidebar. At sidebar, the court instructed the State that it could only comment on the applicable aggravating and mitigating circumstances the evidence would show. The State then commented on three other aggravating circumstances, pecuniary or financial gain, HAC, and CCP, noting, “I anticipate that those possibly could be some of the aggravating circumstances that the Court would give you.” The State followed these comments with a discussion of mitigating circumstances, noting that these encompassed any aspect of the defendant or his life, including his age, and asked a juror whether he felt that he could weigh the penalties in light of evidence of that nature. On the following day of voir dire, the State commented on the same aggravating circumstances in response to a juror’s question. Trial counsel objected again and moved for a discharge of the panel for deliberate misconduct by the State.[26] The trial court overruled the objection and denied the motion.
“The purpose of voir dire is to ‘obtain a fair and impartial jury, whose minds are free of all interest, bias, or prejudice,’ not to shock potential jurors or to obtain a preview of their opinions of the evidence.” Hoskins v. State, 965 So.2d 1, 13 (Fla.2007) (quoting Ferreiro v. State, 936 So.2d 1140, 1142 (Fla.3d DCA 2006)), cert. denied, 552 U.S. 1152, 128 S.Ct. 1112, 169 L.Ed.2d 827 (2008). “The scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused.” Id. (quoting Vining v. State, 637 So.2d 921, 926 (Fla.1994)). Further, “where a juror’s attitude about a particular legal doctrine ... is essential to a determination of whether challenges for cause or peremptory challenges are to be made, it is well settled that the scope of the voir dire properly includes questions about and references to that legal doctrine even if stated in the form of hypothetical questions.” Walker v. State, 724 So.2d 1232, 1233 (Fla.4th DCA 1999) (quoting Lavado v. State, 469 So.2d 917, 919-20 (Fla.3d DCA 1985) (Pearson, J., dissenting), quashed, 492 So.2d 1322 (Fla.1986)); see also Pait v. State, 112 So.2d 380 (Fla.1959) (finding no error where prosecutor propounded question to prospective jurors on voir dire concerning their attitudes toward a finding of guilt on a homicide charge based solely on a theory of felony murder). However, “[t]o the extent hypothetical questions involve the facts of the case they are not allowed.” Blevins v. State, 766 So.2d 401, 402 (Fla.2d DCA 2000).
*807 In the instant case, the State’s questions were directed toward exploring the jurors’ views regarding legal doctrines and the death penalty in the abstract. The State did not tell the jury that these were the aggravators that applied in this case. Instead, the State commented that these ag-gravators “possibly could be some of the aggravating circumstances that the Court would give you.” Furthermore, the State did not ask the jurors what they thought about these aggravators, and the State did not identify any facts in the case. The State followed its comments with a discussion of the mitigating circumstances and whether the juror felt that he could weigh the penalties in light of evidence of that nature. As an example, the State noted that age could be a mitigating factor. Unlike the case law prohibiting hypotheticals involving the facts of the case, the State’s comments were not hypotheticals and did not reference any facts in the case. When read in context, the State’s comments served only to explain the possible aggravating factors based on what the law permits.
Geralds does not argue how the trial court abused its discretion in limiting the aggravating factors the State was permitted to mention to those that the State believed the evidence would support. Indeed, Geralds makes no argument at all that the trial court abused its discretion in this ruling. On this record, we conclude that the State did not make inappropriate comments during voir dire, that the trial court did not abuse its discretion in denying defense counsel’s objections to the comments, and appellate counsel did not render ineffective assistance for failing to raise this claim on appeal. See Rutherford v. Moore, 774 So.2d 687, 643 (Fla.2000) (“[T]he failure of appellate counsel to raise [a] meritless issue will not render appellate counsel’s performance ineffective.”).
In the second category of comments, Geralds raises six instances of prosecutorial comments that were not objected to and argues that appellate counsel was ineffective for failing to raise them on appeal. The first five were raised as ineffective assistance of trial counsel claims in Ger-alds’ postconviction motion. We have already concluded that these claims were properly denied. Accordingly, appellate counsel cannot be deemed ineffective for failing to raise a meritless claim. Id.
The sixth instance of prosecutorial comments concerns statements made during several different bench conferences outside the presence of the jury. The State argued that defense counsel was harassing the State and that “he’s a butt-head.” The State also argued, “So, we’re going to let the defense take and leave a-document out there with a bunch of B.S. that he hadn’t discussed — that’s what we’re doing, Judge?” Finally, the State argued that “[w]hat it is is a trick question to obtain a reversal is what it was.” At most, these comments reflect disrespect to the trial court and to defense counsel. But even if these comments constituted error, the error was not fundamental. Geralds fails to establish that these prosecutorial comments at sidebar raise questions about the validity of the trial itself to the extent that the jury’s verdict could not have been obtained without the assistance of these comments. Indeed, these comments were not even made in front of the jury. Accordingly, we find no merit to Geralds’ claim that appellate counsel was ineffective for failing to argue that the State made improper comments during bench conferences at his resentencing.
3. Weighing Mitigating Evidence
Geralds argues that appellate counsel was ineffective for failing to argue that the trial court did not properly consid *808 er and weigh mitigating evidence. He argues that the trial court’s analysis was flawed because it found that certain mitigating evidence, though it existed, was “not relevant to this crime” and gave it very little weight. According to Geralds, the reference to relevancy indicates that the trial court did not properly weigh the mitigating evidence because mitigating evidence need not be relevant to the crime. We reject this argument.
Section 921.141(1), Florida Statutes (1993), provides that “evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant.” (Emphasis supplied.) While a defendant has the right to present any mitigating circumstance to a jury or judge for consideration as a reason to spare his life, see Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004), the evidence must still meet a threshold of relevance, Farina v. State, 937 So.2d 612, 619 (Fla.2006). “Although the threshold is low, the evidence must tend ‘logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.’ ” Farina, 937 So.2d at 619 (quoting Smith v. Texas, 543 U.S. at 44, 125 S.Ct. 400).[27] In this case, the reference to relevancy does not invalidate the trial court’s analysis because section 921.141(1) and case law require that mitigating evidence be relevant to the circumstances of the offense at issue, Ger-alds’ character, or his prior record. Accordingly, we hold that appellate counsel cannot be deemed ineffective for failing to raise this issue on appeal.
Geralds also argues that because of the reference to relevancy, the trial did not properly weigh evidence that (1) he was nonviolent; (2) he was fifteen years old at the time his parents divorced, and he became involved with a bad crowd; (3) he was a good worker; (4) he helped a friend deal with his parents’ divorce; (5) a mental health professional diagnosed Geralds with bipolar and antisocial personality disorders; and (6) the mental health professional testified that Geralds was depressed from a young age. However, a review of the sentencing order reveals that the trial court did expressly consider some of these circumstances. The trial court specifically found that Geralds was a good worker and that he was diagnosed as having bipolar and antisocial personality disorders. Nevertheless, the trial court failed to expressly consider the other mitigation evidence. This Court has described the need for trial courts to enter sentencing orders “expressly evaluating]” the defendant’s proposed mitigation. Campbell v. State, 571 So.2d 415, 419 (Fla.1990), receded from on other grounds by Trease v. State, 768 So.2d 1050, 1055 (Fla.2000); see also Rogers v. State, 783 So.2d 980, 995 (Fla.2001). Accordingly, appellate counsel could have raised a claim that the trial court erred in not giving more express consideration of this mitigation pursuant to this Court’s mandate to expressly evaluate each mitigating circumstance.
*809 However, even if appellate counsel had raised this claim on appeal, it would not have merited relief because any error by the trial court in not treating this mitigation in greater detail was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). The trial court properly found two substantial aggravating circumstances, including murder committed during the course of a robbery and HAC, which we have said is one of the weightiest aggravators.[28] Very little weight was given to the mitigating circumstances that the order described. Even if the trial court had expressly considered the mitigation evidence that Geralds identifies, there is no reasonable doubt that the trial court would have imposed the death penalty. Indeed, the trial court noted that the “aggravating circumstances far out weigh [sic] the mitigating factors” Geralds presented. Accordingly, we conclude that Geralds cannot establish that he was prejudiced by appellate counsel’s failure to raise this mitigation claim on direct appeal.
4. Admission of Photographs
Geralds argues that appellate counsel was ineffective for failing to challenge the trial court’s decision to admit various gruesome and cumulative photographs of the crime scene and the victim’s autopsy. However, Geralds does not specify which photographs he challenges, did not attach any photographs to his petition, and does not articulate why the photographs are particularly inflammatory or why they are inadmissible under governing case law. Geralds merely argues that photographs should be excluded when the risk of prejudice outweighs relevancy without applying this principle to the specifics of his case. Accordingly, Geralds did not sufficiently plead this claim, and it is procedurally barred. See Belcher v. State, 961 So.2d 239, 253 (Fla.) (rejecting similar claim as insufficiently pleaded where petitioner did not attach the photograph and did not articulate why it was inflammatory or why it was inadmissible), cert. denied, 552 U.S. 1026, 128 S.Ct. 621, 169 L.Ed.2d 400 (2007).
5. Jury Instructions on Flight
Geralds argues that the appellate counsel who represented him during his resentencing appeal was ineffective for failing to argue that the trial court erred in instructing the jury on flight during his initial trial. Geralds does not argue that his appellate counsel for his initial direct appeal was ineffective for not challenging this instruction. Instead, he argues that his resentencing appellate counsel was ineffective. However, Geralds does not establish how resentencing appellate counsel could have properly raised an issue from his initial trial. Resentencing appellate counsel would have been procedurally barred from raising this issue because it is an issue that could and should have been raised in Geralds’ initial direct appeal. See Downs v. State, 977 So.2d 572, 573-74 (Fla.2007), cert. denied, 555 U.S. 954, 129 S.Ct. 450, 172 L.Ed.2d 303 (2008). Accordingly, we reject this claim because appellate counsel cannot be ineffective for failing to raise a procedurally barred issue on appeal.[29]
*810 B. REMANDING FOR AN ADDITIONAL RESENTENCING
Geralds argues that this Court erred when it failed to remand for an additional resentencing after it struck the CCP aggravator in Geralds’ resentencing direct appeal. See Geralds II, 674 So.2d at 103-04. This Court has rejected a similar claim:
As the United States Supreme Court explained in Sochor v. Florida, federal law does not require a state appellate court to remand for resentencing when it determines that an invalid aggravating factor has been weighed by the sentences but the appellate court must “either itself reweigh without the invalid aggravating factor or determine that weighing the invalid factor was harmless error.”
Hardwick v. Dugger, 648 So.2d 100, 106 (Fla.1994) (citation omitted). In Geralds’ case, this Court determined that the application of the CCP aggravating circumstance was harmless error in light of the record, which established “two substantial aggravators ... and mitigation that the trial judge gave ‘little weight.’ ” Geralds II, 674 So.2d at 104. This Court further noted:
[H]aving carefully scrutinized the record in this case, including the jury’s unanimous recommendation of death, we are persuaded beyond a reasonable doubt that even without the aggravating circumstance of cold, calculated, and premeditated murder, the trial court still would have found that the aggravating factors present here substantially outweighed the mitigating evidence.
Id. Accordingly, this claim is without merit.
IV. CONCLUSION
For the reasons explained above, we affirm the trial court’s denial of Geralds’ amended and supplemental postconviction motions, and deny his petition for writ of habeas corpus.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and LABARGA, JJ., concur.
PERRY, J., did not participate.

. The facts surrounding the murder are detailed in our original opinion. See Geralds I, 601 So.2d at 1158-59.

. § 921.141 (5)(d), Fla. Stat. (1993).

. Id. § 921.141 (5)(h).

. Id. § 921.141(5)6).

. Id. § 921.141(6)(g).

. We outlined Geralds’ claims in Geralds II, 674 So.2d at 98 n. 6.

. Geralds argued: (1) section 119.19 of the Florida Statutes and Florida Rule of Criminal Procedure 3.852 are unconstitutional and that he had been denied access to public records; (2) the jury qualification procedure violated constitutional and state statutory provisions; (3) pretrial publicity prevented him from receiving a fair trial or a fair resen-tencing; (4) he was denied due process and equal protection due to ineffective assistance of counsel (IAC) during the guilt phase, the State’s failure to disclose exculpatory evidence, and improper and prejudicial prosecu-torial and judicial misconduct; (5) counsel had a conflict of interest; (6) the State withheld material and exculpatory evidence or presented misleading evidence; (7) improper prosecutorial comments were made and counsel was ineffective for not objecting; (8) newly discovered evidence; (9) Florida's capital sentencing scheme is unconstitutional; (10) Florida's capital sentencing scheme violates Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (11) several IAC claims regarding penalty phase representation; (12) IAC at the guilt and penalty phases because counsel failed to obtain an adequate mental health evaluation; (13) the trial court erred in allowing the State to present hearsay testimony at the resentenc-ing, and counsel was ineffective for not objecting; (14) the CCP aggravating factor and *786 instructions were unconstitutionally vague; (15) the trial court erred in instructing the jury on the HAC aggravator, and counsel was ineffective for not objecting; (16) the murder in the course of a felony aggravator is unconstitutional as an automatic aggravating circumstance, and counsel was ineffective for not objecting; (17) the State improperly introduced and argued nonstatutory aggrava-tors, and counsel was ineffective for not objecting; (18) the jury was given incorrect penalty phase instructions, and counsel was ineffective for not objecting; (19) the jury was misled by instructions, and counsel was ineffective for not objecting; (20) Geralds is innocent of first-degree murder; (21) the Florida Supreme Court erred by not remanding for resentencing after striking the CCP aggravator; (22) Geralds was denied a proper appellate review because there were omissions in the record, and counsel was ineffective for not objecting; (23) there was error in the instruction on flight, and counsel was ineffective for not objecting; (24) cumulative error deprived Geralds of a fair trial; (25) Florida Rule of Professional Conduct 4-3.5(d)(4) unconstitutionally prohibited him from interviewing jurors; and (26) lethal injection is unconstitutional.

. Huff v. State, 622 So.2d 982 (Fla.1993).

. The supplements did not add any new claims.

. At the evidentiary hearing, Geralds introduced a handwritten list that describes a "Herringbone necklace thick gold [and] comes down into a V shape but doesn’t lay flat.” The list also describes several other pieces of jewelry, including necklaces, bracelets, watches, and one pair of Bucci sunglasses. The list is marked "Received 02-15-89" across the top.

. Evidence linking Geralds to the crime included a gold herringbone chain necklace, which Geralds pawned. Serology testing of the necklace revealed a stain that was compatible with the victim’s blood type and inconsistent with Geralds' blood type. Geralds I, 601 So.2d at 1158.

. At the evidentiary hearing, Geralds introduced Zeigler’s report, which totals eight pages and analyzed six lab submittals. Each lab submittal contained several different items for analysis. Zeigler found that a handkerchief listed within lab submittal 03 demonstrated the presence of human blood staining. Zeigler concluded that the handkerchief was stained with blood type O, while Geralds and the victim both have blood type A. Zeigler tested the sneakers, which were listed within lab submittal 06, for blood staining and found none.

. At the evidentiary hearing, Geralds introduced Jimmerson's note, which is dated January 26, 1990. Next to the date there is a notation that reads "Tony Swobata [sic]— Gordon’s Jewelry.” The note then provides, "It was a thin chain[;] don’t remember the length!;] price?!;] I sold it to him under the table!;] no records.”

. At the evidentiary hearing, Geralds introduced two exhibits regarding Danford’s criminal charges. The first exhibit is a case history *790 of diree separate incidents. The first incident shows that Danford was charged with, but found not guilty of, driving a vehicle on a sand dune in 1987. The second and third incidents show that Danford was charged with failure to record transactions by a pawn broker in April 1989 and October 1989; each case was dropped within the same month that the charges were filed. The second exhibit is a note, dated July 19, 1990, written by a state attorney to a detective stating that after reviewing the investigative files on charges that Danford was dealing in stolen property, the State could not prove the charges and declined to prosecute.

. At the evidentiary hearing, Geralds introduced Investigator Jimmerson’s notes regarding an interview with Toriac. "Gregg Toriac” is written across the top of the note and reads in whole:
Middlebrooks & myself were discussing William Pelton (01-26-90) & we know he would leave work alot [sic] & stopped at Radio Shack & would bring in a reciept [sic] to show or cover why he was missing or gone so long.
Dave Meadows [the manager of Club LaVela] did write his time in on Feb. 1, *791 1989 but he is like us wouldn’t really know if William stayed or left that day.

. "The purpose of closing argument is to help the jury understand the issues in a case by 'applying the evidence to the law applicable to the case.’ " Murphy v. Int'l Robotic Sys., Inc., 766 So.2d 1010, 1028 (Fla.2000) (quoting Hill v. State, 515 So.2d 176, 178 (Fla.1987)). As the Second District Court of Appeal noted:
Although it is axiomatic that the arguments of counsel are not evidence, it would be naive to suppose that they do not have a profound effect upon the jury. These summarizing remarks often tie together for the jurors previously unconnected or seemingly irrelevant testimony, and highlight those phases of the evidence considered most favorable by each of the opposing parties. In short, the closing argument is a crucial phase of a lawsuit....
Collins Fruit Co. v. Giglio, 184 So.2d 447, 449 (Fla.2d DCA 1966).

. Evidence linking Geralds to the crime included a plastic tie recovered from the victim’s wrist. This tie matched those found in Geralds' car. Geralds I, 601 So.2d at 1159.

. At trial, Douglas Freeman, Geralds’ grandfather, testified that Geralds was wearing gloves that had the backs and tops of the fingers cut out. At closing argument, the State argued that Geralds wore gloves, "[t]he kind that don’t leave fingerprints in houses.’’

. We also note that the resentencing trial court entered an order to hire an investigator on October 5, 1992. On November 18, 1992, trial counsel filed a motion for continuance, arguing, in part, that the investigator "has been conducting background investigation” and that additional time was necessary to prepare for resentencing. Geralds does not establish how or why the postconviction trial court should have found that this investigation was inadequate.

. On appeal from Geralds’ resentencing, we held that the trial court did not err in allowing Dr. Lauridson to testify using Dr. Sybers’ materials. Geralds II, 674 So.2d at 100.

. In holding that the public records request had very little identifying information, the court noted, "For example, like a Roosevelt Thomas, there could be all kinds of Roosevelt Thomases, believe it or not, I think we have two in Bay County that are.... That I know of, yeah, that I’ve had contact with in the Court system.”

. The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions the accused has the right "to be confronted with the witnesses against him.” U.S. Const, amend. VI.

. The Supreme Court overruled this approach in Crawford, v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), wherein it held that a testimonial hearsay statement is inadmissible at trial unless the declarant is shown to be unavailable and the party against whom the statement is admitted had an opportunity for cross-examination. Id. at 68, 124 S.Ct. 1354. This Court has since held that Crawford does not apply retroactively. Chandler v. Crosby, 916 So.2d 728 (Fla.2005). Crawford does not apply to Ger-alds because his case became final almost eight years before Crawford was decided. See Geralds v. Florida, 519 U.S. 891, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996) (denying certio-rari).

. When the declarant is unavailable as a witness, Florida’s Evidence Code provides an exception from the hearsay rule for
[testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
§ 90.804(2)(a), Fla.Stat. (1993).

. Federal courts have also held that Federal Rule of Evidence 804(b)(1), the equivalent of Florida’s former testimony rule, is a firmly rooted exception. See, e.g., United States v. Avants, 367 F.3d 433, 445 (5th Cir.2004); see also Mancusi v. Stubbs, 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) (noting that at least since Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), "prior-recorded testimony has been admissible in appropriate cases”).

. At sidebar, the State argued that the trial court permitted it to "go over the anticipated aggravating circumstances that I anticipated the evidence would show. That's what I’m doing.” The State also argued that even though the Florida Supreme Court reversed the CCP aggravator in Geralds' initial appeal, the State still intended on presenting evidence on the CCP aggravator in an attempt to convince the court that there was sufficient evidence to instruct on CCP.

. In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a case Geralds cites for support, the United States Supreme Court held that the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” Id. at 604, 98 S.Ct. 2954 (plurality opinion). This Court has held that Lockett requires the "admission of evidence that establishes facts relevant to the defendant’s character, his prior record, and the circumstances of the offense in issue.” Hess v. State, 794 So.2d 1249, 1269 (Fla.2001) (emphasis added) (quoting Herring v. State, 446 So.2d 1049, 1056 (Fla. 1984), receded from on other grounds by Rogers v. State, 511 So.2d 526, 533 (Fla.1987)).

. See Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002); Larkins v. State, 739 So.2d 90, 95 (Fla.1999).

. We also note that the issue has no merit. Geralds cites this Court's decision in Fenelon v. State, 594 So.2d 292 (Fla.1992), wherein this Court held that a trial court commits error when it instructs on flight. Id. at 295. Nevertheless, Fenelon was intended to be prospective in application. Id.; see also Taylor v. State, 630 So.2d 1038, 1041-42 (Fla.1993) (“This Court intended that the holding in Fen-elon be applied prospectively only....”). Because Geralds was tried, convicted, and sentenced in 1990 and Fenelon was not decided *810 until 1992, the trial court did not err in instructing the jury on flight. See Taylor, 630 So.2d at 1042 (holding that trial court did not err in instructing on flight because the defendant was tried before Fenelon was issued). Accordingly, even if resentencing appellate counsel were not procedurally barred from raising this issue, counsel could not be ineffective for failing to raise a meritless argument.